# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARTIN ENERGY SERVICES, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-2986**<br>**c/w 15-79 c/w 15-81** |
| **M/V BOURBON PETREL, her engines, tackle, bunkers, Etc.,** *in rem*, **and BOURBON PETREL SNC AND BOURBON OFFSHORE GREENMAR, S.A.,** *in personam* | **SECTION "L" (4)** |

## ORDER AND REASONS

Before the Court is a motion for summary judgment filed by CGG Services (U.S.), Inc., CGG Services S.A., SNC Bourbon CE Petrel, Sea Support Ventures, LLC, and Rederij Groen BV. R. Doc. 130. Plaintiff opposes. R. Doc. 133. Having considered the parties briefs, oral argument, and applicable law, the Court now issues this Order and Reasons.

## I.     BACKGROUND

These consolidated cases arise out of three instances in which Plaintiff Martin Energy supplied fuel and water to a fleet of vessels chartered by CGG U.S. and/or CGG S.A. In the fall of 2014, CGG U.S., the United States subsidiary of CGG S.A., was conducting seismic operations off the coast of Louisiana with the GEO CELTIC, OCEANIC SIRIUS, and OCEANIC VEGA (collectively, the "Seismic Vessels"). CGG was responsible for ensuring that the Seismic Vessels were supplied with fuel and water. Before the three fuel deliveries at issue in this case, CGG U.S. purchased it directly from suppliers like Martin Energy.

In October 2014 CGG reached its credit limit with Martin Energy and began purchasing fuel for the Seismic Vessels from O.W. Bunker USA Inc. ("O.W. Bunker"). CGG would notify

1

O.W. Bunker of its anticipated fuel needs, and O.W. Bunker would contact Port Fourchon suppliers like Martin Energy and Stone Oil to determine fuel availability and the sales price, which it would then communicate to CGG. CGG directed O.W. Bunker to select Martin Energy as supplier of the fuel at issue because it provided the lowest sales price.

The fuel at issue here was delivered to the Seismic Vessels by three supply vessels – the M/V BOURBON PETREL, owned by SNC Bourbon CE Petrel, the M/V OMS RESOLUTION, owned by Rederij Groen BV, and the M/V MISS LILLY, owned by Sea Support Ventures, LLC (collectively, the "Supply Vessels"). For the three fuel transactions, (1) CGG issued purchase orders to O.W. Bunker; (2) O.W. Bunker issued purchase order confirmations to Martin Energy; (3) Martin Energy issued invoices to O.W. Bunker; and (4) O.W. Bunker issued invoices to CGG. Each document referred to an individual Supply Vessel as the receiving vessel.

Martin Energy delivered 450 cubic meters of fuel to the M/V MISS LILLY, 800 cubic meters to the OMS RESOLUTION, and 500 cubic meters to the M/V BOURBON PETREL. The fuel deliveries were placed in the cargo tanks of the Supply Vessels. The M/V BOURBON PETREL and the M/V OMS RESOLUTION have fuel cargo tanks that are physically separate from the vessels' "day tanks" that supply fuel to the vessel's engines. Fuel placed in their cargo tanks cannot be consumed by the vessels themselves. The M/V BOURBON PETREL transferred its 750 cubic meters of fuel (including the 500 cubic meters supplied by Martin Energy) to the GEO CELTIC, and the M/V OMS RESOLUTION transferred its 800 cubic meters of Martin Energy fuel to the OCEANIC VEGA.

The M/V MISS LILLY fuel consumption and transfers are more complicated. The vessel has piping that connects its cargo tanks to its day tanks, and it is capable of – and did – transfer some fuel from its cargo tanks to its day tanks during the relevant time period. Before the M/V

MISS LILLY was loaded with any Martin Energy fuel, the vessel already had approximately 13,895 gallons of diesel onboard ("Onboard Diesel"). R. Doc. 130-3 at 3. When the vessel was loaded with 118,800 gallons (450 cubic meters) of Martin Energy diesel fuel, that diesel and the Onboard Diesel were commingled in the vessel's cargo tanks. From October 27, 2014 (when the Martin Energy gallons were placed in the MISS LILLY's cargo tanks) to November 15, 2014 (when the last gallon of Martin Energy fuel was transferred to the Seismic Vessels), the MISS LILLY transferred 12,788 gallons of fuel into its day tanks.

Martin Energy has not been paid. The non-payment was at least initially due to the global collapse of O.W. Bunker and related bankruptcy proceeding. Martin Energy sued each of the Supply Vessels *in rem* and their owners *in personam*, and the suits were consolidated. The vessel owners made a Rule E(8) appearance and posted a bond to stand in place of the vessels. CGG S.A. and CGG U.S. joined these restricted appearances. O.W. Bunker intervened, asserting rights of its own as the contract intermediary between Martin Energy and CGG. O.W. Bunker and Martin Energy asserted crossclaims against CGG U.S.

## I.      PRESENT MOTION

CGG U.S., CGG S.A.[1], SNC Bourbon CE Petrel, Sea Support Ventures, LLC, and Rederij Groen BV (collectively, "Defendants") move for summary judgment seeking dismissal of the *in rem* and *in personam* claims asserted by Martin Energy in this case. Martin Energy opposes.

### a.  Defendants' Motion for Summary Judgment

Defendants argue that Martin Energy did not provide "necessaries" to any of the Supply Vessels because the M/V BOURBON PETREL and the M/V OMS RESOLUTION did not

---

[1] CGG S.A. is making a special appearance as the time charter of the M/V BOURBON PETREL and M/V OMS RESOLUTION.

consume the Martin Energy fuel and the M/V MISS LILLY already had sufficient fuel onboard to accomplish the transfer of Martin Energy bunkers to the Seismic Vessels.

Even if the Martin Energy fuel constituted "necessaries" for the Supply Vessels, Defendants contend that Martin Energy waived its lien by refusing to extend credit to CGG and instead contracting with O.W. Bunker. According to Defendants, when a supplier rejects the credit of a party authorized to act on behalf of a vessel (i.e., when Martin Energy refused to sell directly to CGG due to credit concerns), it explicitly does not rely on the credit of the vessel and foregoes all lien rights.

Assuming (a) the fuel was necessary, and (b) Martin Energy did not waive its lien by rejecting the credit of CGG, Defendants argue that Martin Energy's fuel was provided on the order of O.W. Bunker – not on the order of the owner or a person authorized by the owner – and *Valero Marketing & Supply Co. v. M/V Almi Sun*, 893 F.3d 290 (5th Cir. 2018) affirms that Martin Energy does not have a lien.

Turning to Martin Energy's *in personam* claims, Defendants contend that Martin Energy's breach of contract claims against SNC Bourbon CE Petrel, Rederij Groen BV, and Sea Support Ventures, LLC (collectively, "Vessel Owners") must be dismissed because they had no contract with Martin Energy and were not involved in these transactions. The Vessel Owners also argue that Martin Energy's unjust enrichment claims asserted against them must be dismissed, because (1) they were not enriched, since the fuel was consumed by the Seismic Vessels, which they do not own, (2) O.W. Bunker's bankruptcy and Martin Energy's refusal to extend credit to CGG serves as justification or cause for any impoverishment, and (3) there is a remedy available at law, which Martin Energy has pursued by filing a Notice of Appearance and Proof of Claim in the O.W. Bunker Bankruptcy proceeding. Likewise, CGG avers that Martin Energy's unjust enrichment

claim against it is unfounded because it paid O.W. Bunker for the fuel at issue after O.W. Bunker seized one of the Seismic Vessels last year.

### b. Martin Energy's Opposition

In opposition, Martin Energy argues that (1) its fuel constituted "necessaries" for the Supply Vessels because they were functioning as "floating gas stations," (2) it has maintained, rather than waived its lien rights, and (3) *Valero Marketing* is inapplicable because CGG ordered the Martin Energy fuel. The only *in personam* claim Martin Energy addresses in opposition is for unjust enrichment against CGG. Martin Energy contends that CGG "should not be allowed to defeat this claim based on an alleged settlement with some O.W. Bunker entity three years after the fuel was supplied." R. Doc. 141 at 5. Because CGG did not pay anyone for the fuel for nearly three years, Martin Energy asserts that CGG was at least unjustly enriched for that period of time.

## II. LEGAL STANDARD

Summary judgment is proper if the pleadings and evidence show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If that burden is met, the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996), "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Hopper v. Frank*, 16 F.3d 92, 97 (5th

Cir. 1994). A court must assess the evidence, review the facts, and draw any appropriate inferences in the light most favorable to the party opposing summary judgment. *See Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001).

## III.    DISCUSSION

"The federal maritime lien is a unique security device, serving the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away." *Equilease*, 793 F.2d at 602. Under the Commercial Instruments and Maritime Lien Act ("CIMLA"), a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner (1) has a maritime lien on the vessel; (2) may bring a civil action *in rem* to enforce the lien; and (3) is not required to allege or prove that credit was given to the vessel. 46 U.S.C. § 31342.

### 1.    Whether Martin Energy Provided "Necessaries" to the Supply Vessels

Defendants argue that the Martin Energy fuel was not necessary for any of the Supply Vessels because the M/V BOURBON PETREL and the M/V OMS RESOLUTION did not consume it and the M/V MISS LILLY already had sufficient fuel onboard. To classify fuel transported as cargo to be consumed by other vessels, they argue, would be inconsistent with "the Fifth Circuit's test of 'whether the goods or services are necessary for the continued operation of the vessel.'" R. Doc. 145 at 2. Because the Supply Vessels could ply the seas without the Martin Energy fuel, Defendants contend it cannot be considered necessary.

The Fifth Circuit's test, however, is not so limited:

> The term "necessary" under the FMLA includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged. These "things" may be money, labor, and skill, and personal services as well as

materials. "It is the present, apparent want of the vessel, not the character of the thing supplied, which makes it a necessary."

*Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986) (en banc) (internal citations omitted).

Indeed, consistent with the goal of protecting those who provide vessels with required goods and services, courts have broadly interpreted what constitutes "necessaries" under the Act in light of the vessel's particular function. *See, e.g.*, *Stern, Hays & Lang, Inc. v. M/V Nili*, 407 F.2d 549 (5th Cir. 1969) (advertising services for cruise ship); *Walker-Skageth Food Stores v. The Bavois*, 43 F. Supp. 109, 111 (S.D.N.Y. 1942) (liquor for pleasure yacht); *Allen v. The Contessa*, 196 F. Supp. 649, 651 (cigarettes for shrimping vessel). For example, in *Portland Pilots v. NOVA STAR, M/V*, the First Circuit held that linens supplied to a vessel serving as "the functional equivalent of a mobile hotel" were necessaries. 875 F.3d 38, 45 (1st Cir. 2017) (Though the in rem claim asserted "bears no particular relation to the NOVA STAR <u>qua</u> a ship … Appellant may still be entitled to a maritime lien by showing that it provided items that were 'necessary' to the ship's intended purpose."). Because "hotels, by their very nature, require clean linens," the linens enabled the ship to perform her particular function and gave rise to a maritime line. *Id.; see also J. Ray McDermott & Co. v. Off-Shore Menhaden Co.*, 262 F.2d 523, 525 (5th Cir. 1959) (To determine which goods and services are necessaries, "regard must be had to the character of the voyage or the employment in which the vessel is being used."); *Foss Launch & Tug Co. v. Char. Ching Shipping U.S.A., Ltd.*, 808 F.2d 697, 699 (9th Cir. 1987) (The term "necessaries," "in modern interpretations, has been expanded to encompass any item which is reasonably needed for the venture in which the ship is engaged.") (internal quotations omitted).

The Supply Vessels' "missions were to deliver fuel, water and other supplies to the Seismic Vessels operating off the coast of Louisiana." R. Doc. 130-1 at 11. The Martin Energy fuel was

necessary for the vessels to function as "floating gas stations" and fulfill this mission. *See also Clubb Oil Tools., Inc. v. M/V George Vergottis*, 460 F. Supp. 835, 841 (S.D. Tex. 1978) ("[T]he furnishing of oil pipe was reasonably required to facilitate the vessel's mission.").

*Trico Marine Operations, Inc. v. Falcon Drilling Co.* involves a similar circumstance of supply vessels "transport[ing] equipment and supplies [such as water and fuel] to sustain the crew" of a drilling vessel. 116 F.3d 159, 162 (5th Cir. 1997). The Fifth Circuit held that the supply vessels' "services of transporting the supplies and equipment which were essential to sustain the crew and operations aboard the [drilling vessel] were necessaries [for the drilling vessel]." *Id.* Defendants contends that *Trico Marine* stands for the proposition that the Seismic Vessels, as the ultimate recipients, are the vessels for whom the Martin Energy fuel was necessary. However, no lien claims were asserted against the supply vessels in *Trico Marine* – the case does not compel the conclusion that the Martin Energy fuel delivered to these Supply Vessels were not necessaries for *their* services.

### 2. Whether Martin Energy Waived its Lien

Defendants next argue that Martin Energy waived its lien by refusing to extend credit to CGG. Under the CIMLA, a supplier of necessaries "is not required to allege that credit was given to a vessel." 46 U.S.C. § 31342(a)(3). Rather, a presumption arises that the supplier acquires a maritime lien, and the party attacking this presumption must establish that the personal credit of the owner or another third party was solely relied upon. *Racal Survey U.S.A., Inc. v. M/V COUNT FLEET*, 231 F.3d 183, 189 (5th Cir. 2000). "To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien." *Id., see also Pacorini USA Inc. v. ROSINA TOPIC MV*, 127 F. App'x 126, 130 (5th Cir. 2005) ("To overcome this presumption, a defendant bears the burden of showing that the plaintiff took affirmative

actions that manifested plaintiff's clear, purposeful, and deliberate intention to forego the maritime lien.").

In *Equilease,* the Fifth Circuit, sitting en banc, held that an insurance broker waived its right to a maritime lien. 793 F.2d at 607. Two items from the record overcame the presumption of reliance on the credit of the vessels. First, testimony indicated that the insurance broker looked solely to the charterer, financing corporation, or another party other than the vessels. *Id.* at 606 ("So you are saying you relied only on Dunnamis Equilease, and/or Eltra, is that a fair statement?" "That's a fair statement."). Second, the insurance broker admitted to sole reliance on a party other than the vessel in its brief: "The Unilease Companies were totally funded for the operations of the Vessels by Equilease and it was the credit of Equilease upon which all parties placed total reliance." *Id.* This evidence, the court concluded, established that the insurance broker "did not rely on the credit of the vessels, either wholly or in part." *Id.* at 607.

Similarly, In *Racal Survey*, the Fifth Circuit concluded that a creditor purposefully intended to forego its lien based on the creditor company president's testimony that there was no reliance on the vessel. In finding waiver, the court noted that "[a]lmost nothing is more conclusive than such testimony" as to whether the supplies were provided on the credit of the vessels. *Id.* at 190. The court reasoned:

> When evidence reveals that a supplier looked solely to a party other than a vessel for payment, we are persuaded that the supplier was not relying on the credit of the vessels because of the logical inference that can be derived from that evidence. In the instant case, we need not trouble ourselves with any inference as the evidence is directly on point. Accordingly, consistent with *Equilease*, because the testimony explicitly shows that Racal deliberately chose not to reply on the credit of the four chartered vessels, as a matter of law, Racal purposefully intended to forego its maritime lien.

*Id.* (citing *Equilease*, 793 F.2d at 606, n.9).

Since "the statutory presumption in favor of a maritime lien is a strong one, we are usually reluctant to conclude that a supplier has waived its lien." *Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 471 (5th Cir. 2003). In *Equilease* and *Racal Survey*, there was clear testimonial evidence from the party seeking to assert the lien that it did not rely on the credit of the vessel. But as long as the supplier relied on the vessel *to some extent*, waiver will not be found. *Id.* at 473 ("[A]lthough the testimony as a whole shows that Maritrend relied on [the charterer] for payment, it also shows that Maritrend did not rely solely on [the charterer] because it was aware of and generally relied upon its maritime lien rights against the SEVILLA WAVE … Maritrend always intended to rely on the credit of the vessel as a 'fallback'").

The fact that Martin Energy refused to extend credit directly to CGG and instead contracted with O.W. Bunker does not establish that Martin Energy deliberately intended to forego its lien. The Martin Energy invoices for the fuel at issue here incorporated Martin Energy's General Terms & Conditions, which provided that:

> In performing the Work, MES has relied upon the credit of Purchaser and, if Work has been supplied to a vessel, MES has also relied upon the credit of the vessel. MES shall have a maritime lien against said vessel until the invoice relating to said Work has been paid in full and MES expressly DOES NOT WAIVE any such maritime lien.

R. Doc. 133-1 at 8.

Additionally, at each delivery, an Authorized Officer of the Supply Vessel signed a Bunkering Certificate, which stated that:

> No disclaimer or stamp of any type or form will be accepted on this bunkering certificate, nor, should any such stamp be applied, will it alter, change, or waive MARTIN ENERGY SERVICES LLC's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

R. Doc. 133-1 at 13.

There is no doubt that Martin Energy relied on the credit of O.W. Bunker – but the evidence does not establish that it deliberately intended to forego its lien rights by relying *solely* on the credit of O.W. Bunker. In fact, there is documentary evidence indicating that Martin Energy retained its lien on the vessels. That Martin Energy relied partly – or even primarily – on O.W. Bunker in supplying the fuel does not establish that it intended to forego its lien. The relevant Bunkering Certificates and invoices suggest that Martin Energy was aware of its lien rights and ability to assert them as a "fallback position" in the event of non-payment by O.W. Bunker. *See C-Port/Stone, LLC v. Gulf Logistics, LLC in personam, M/V GREY CUP in rem*, No. 17-256, 2018 WL 4680213, at *2 (E.D. La. Sept. 28, 2018) ("Further, the standard language in C-Port/Stone's delivery tickets expressly stated that C-Port/Stone was affirmatively relying on its presumed rights under maritime law to encumber the vessel in satisfaction of the invoices for the products delivered."). Resorting to a lien as a fallback position in the event of default or non-payment is typical of what is done in the normal course of business and does not overcome the presumption of credit to the vessel. *Maritrend*, 348 F.3d at 475-76 ("Although Maritrend expected [the charterer] to pay for the stevedoring services, and its conduct reflected that reasonable expectation, Bergeron's trial testimony established that Maritrend relied on the credit of the SEVILLA WAVE as a 'fallback position,' which is exactly what the law contemplates."). Accordingly, Defendants have not overcome the presumption that Martin Energy relied on the credit of the vessel when it supplied the fuel at issue.

**3.** ***Valero Marketing***

To have a maritime lien, Martin Energy must have supplied the fuel to the Supply Vessels "on the order of the owner or a person authorized by the owner." Defendants contend that Martin

Energy supplied the fuel on the order of O.W. Bunker – an intermediary not authorized to procure necessaries as the CIMLA requires.

Situations where an entity supplying necessaries lacks privity of contract with the vessel owner and instead contracts with an intermediary are governed by two lines of cases: the general contractor/subcontractor line, and the principal/agent or "middle-man" line. *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 202, 228 (5th Cir. 1999). In the general contractor/subcontractor line, a general contractor contracts to supply necessary goods or services to a ship, but subcontracts all or some of the task to a subcontractor. The general contractor will have a lien, but subcontractors hired by them "are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." *Id.* at 229. In the "middle-man" line of cases, the necessaries provider has a lien despite the presence of intermediaries.

In *Valero Marketing & Supply Co. v. M/V Almi Sun*, the Fifth Circuit held that a bunker supplier that contracted with O.W. Bunker could not assert a maritime lien against the vessel that received its fuel because it could not show that the necessaries were supplied "on the order of the owner or a person authorized by the owner" as the CIMLA requires. 893 F.3d 290 (5th Cir. 2018). There, an agent for the vessel's owner contracted with O.W. Bunker to procure bunkers. *Id.* at 290. The agent requested the name of the physical supplier, and O.W. Bunker named Valero. *Id.* O.W. Bunker filed for bankruptcy shortly after, and Valero brought an *in rem* action seeking a maritime lien in the amount of the bunkering. *Id.* The court reasoned that this situation fell within the "subcontractor" line of cases – meaning Valero must establish that an entity authorized to bind the ship controlled its selection and/or performance. *Id.* at 295-6. The court held that the vessel's "mere

awareness" that Valero was the physical supplier did not suffice, and Valero was not entitled to a maritime lien. *Id.*

Defendants argue that, like *Valero Marketing*, Martin Energy provided the fuel on the order of O.W. Bunker – an entity not authorized by the owner to procure necessaries. Martin Energy responds that Defendants' "almost passing" reference to *Valero Marketing* is "likely because CGG realizes that in these cases" – i.e., the present cases – "it did order the fuel and water." R. Doc. 133 at 18.

In the present case, each time Martin Energy fuel was supplied, O.W. Bunker presented CGG with two bids – one from Martin Energy and one from Stone Oil, with the price quoted by each. In all three instances, CGG instructed O.W. Bunker to choose Martin Energy's lower bid. R. Doc. 133-1 at 1, R. Doc. 141-1 at 11-12 ("Q. But when they communicated the price to you, they also communicated the identity of the vendor, correct? A. Correct. But they would also tell you, here are your vendors, here are the prices, this is what we're recommending as a lowest price. Q. And then CGG would instruct O.W. Bunker to proceed with whichever entity was providing the lowest price? A. Correct."). Accordingly, unlike *Valero Marketing*, an entity authorized to bind the vessel controlled the selection of Martin Energy as physical supplier.

### 4. Breach of Contract Claims

Next, SNC Bourbon, Sea Support, and Rederij Groen (collectively, the "Vessel Owners") argue that Martin Energy's *in personam* breach of contract claims against them must be dismissed. Martin Energy's opposition does not address its breach of contract claims. The Vessel Owners were not involved in the transactions at issue here. As the Fifth Circuit has recognized, "[t]he owner of the vessel is not itself liable for payment, however, unless it has entered into the contract for the supply of necessaries. It has no personal obligation even though a lien attaches to its vessel."

*Belcher Co. of Alabama v. M/V Maratha Mariner*, 724 F.2d 1161, 1163 (5th Cir. 1984). Accordingly, CGG's motion for summary judgment is granted as to Martin Energy's breach of contract claims against the Vessel Owners.

### 5. Quantum Meruit and Unjust Enrichment

Martin Energy's remaining claims are for unjust enrichment against CGG U.S. and quantum meruit against CGG U.S. and the Vessel Owners. Martin Energy's opposition only addresses its unjust enrichment claim against CGG U.S. Accordingly, all other *in personam* claims against CGG U.S., SNC Bourbon CE Petrel, Sea Support Ventures, LLC and Rederij Groen BV are dismissed.

To succeed on its unjust enrichment claim against CGG U.S., Martin Energy must prove (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the resulting impoverishment, (4) an absence of justification or cause for the enrichment and impoverishment, and (5) there must be no other remedy available at law. *Cenac v. Orkin LLC*, No. 15-4521, 2018 WL 2970838, at *9 (E.D. La. June 13, 2018).

CGG U.S. paid an O.W. Bunker entity for the fuel at issue after O.W. Bunker seized one of the Seismic Vessels.[2] That being so, Martin Energy cannot establish that CGG has been enriched without cause, and an unjust enrichment claim does not lie.

### IV. CONCLUSION

---

[2] Pursuant to a May 5, 2017 Release and Settlement Agreement, CGG paid O.W. Bunker $1.4 million to settle four outstanding invoices. R. Doc. 130-3 at 27. The total principle amount on those invoices was $1,455,591.01, comprised of $1,243,124.09 associated with the Martin Energy related invoices and $212,466.92 unassociated with Martin Energy. The invoices associated with Martin Energy are (1) Invoice No. 190-11139 dated November 5, 2014 in the amount of $358,864.39, (2) Invoice No. 190-11132 dated November 1, 2014, in the amount of $318,015.67, and (3) Invoice No. 190-11133 dated November 1, 2014, in the amount of $566,244.03.

For the foregoing reasons, **IT IS ORDERED** that Defendants' Motion for Summary Judgment is hereby **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to Plaintiff's *in personam* claims and denied as to Plaintiff's *in rem* claims.

New Orleans, Louisiana this 20th day of November, 2018.

UNITED STATES DISTRICT COURT JUDGE