**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MARTIN ENERGY SERVICES, LLC**<br><br>**VS.**<br><br>**M/V BOURBON PETREL, her engines, tackle, bunkers, etc.** *in rem*, **and BOURBON PETREL SNC and BOURBON OFFSHORE GREENMAR S.A.,** *in personam* | **CIVIL ACTION NO.: 02:14-cv-2986 c/w 02:15-cv-00079 and 02-15-cv-00081**<br><br>**RE:  ALL CASES**<br><br>**SECTION " L"/ DIVISION " 4 "**<br><br>**JUDGE FALLON**<br><br>**MAGISTRATE ROBY** |

**PLAINTIFF MARTIN ENERGY SERVICES, LLC'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

NOW INTO COURT, through undersigned counsel, comes Plaintiff Martin Energy

Services, LLC ("Martin") and submits the following Proposed Findings of Fact and Conclusions

of Law:

**I.**
**Procedural History and Background**

1. Martin provided fuel and water to three offshore tugs chartered by CGG Services U.S.,

    Inc. ("CGG"), at an agreed price of over $1.2 million.  Vessel interests ordered fuel from

    Martin.  Martin delivered the fuel to the vessels. Martin has not been paid and this suit

    followed.

2. On December 30, 2014, Martin commenced the instant action against the first fueled

    vessel, the M/V BOURBON PETREL *in rem*, and its owners BOURBON PETREL SNC

    and BOURBON OFFSHORE GREENMAR S.A., in personam.  Martin's complaint

    asserted claims under alternate theories of breach of contract, quantum meruit, and the

    Federal Maritime Lien Act, 46 U.S.C. 31343, et seq.  Martin's complaint seeks damages

in the amount of $355,212.00, plus prejudgment interest and costs.  In addition, Martin asked the Court to arrest the M/V BOURBON PETREL.

3.  On January 13, 2015, Martin commenced an action against the second of the three fueled vessels, the M/V MISS LILLY, *in rem*, and its owner Sea Support Ventures, LLC, in personam.  Martin's complaint, similar to its complaint against the BOURBON PETREL and its owners, asserted claims under alternate theories of breach of contract, quantum meruit, and the Federal Maritime Lien Act, 46 U.S.C. 31343, et seq.  Martin's complaint seeks damages in the amount of $314,013.00, plus prejudgment interest and costs.  In addition, Martin asked the Court to arrest the M/V MISS LILLY.

4.  Also on January 13, 2015, Martin commenced an action against the last of the three fueled vessels, the OMS RESOLUTION, *in rem*, and its owner Rederij Groen BV, in personam.  Martin's complaint, similar to its complaints against the BOURBON PETREL, the MISS LILLY, and their owners, asserted claims under alternate theories of breach of contract, quantum meruit, and the Federal Maritime Lien Act, 46 U.S.C. 31343, et seq.  Martin's complaint seeks damages in the amount of $559,137.79, plus prejudgment interest and costs.  In addition, Martin asked the Court to arrest the OMS RESOLUTION.

5.  On January 16, 2015 the owners and charterers of the BOURBON PETREL, SNC Bourbon CE Petrel, CGG Services S.A., and CGG Services U.S., Inc., filed a Statement of Right or Interest in the subject vessel.  Contemporaneously BOURBON PETREL SNC, Bourbon CE Petrel and BOURBON OFFSHORE GREENMAR S.A filed a Special Vessel Release Bond in lieu of Martin's arrest of the BOURBON PETREL.

6. On January 30, 2015, the owner and charterers of the M/V MISS LILLY, Sea Support Ventures, LLC, CGG Services S.A., and CGG Services U.S., Inc., filed a Statement of Right or Interest in the subject vessel. Contemporaneously Sea Support Ventures, LLC filed a Special Vessel Release Bond in lieu of Martin's arrest of the MISS LILLY.

7. Also on January 30, 2015, the owner and charterers of the OMS RESOLUTION, Rederij Groen BV, CGG Services S.A., and CGG Services U.S., Inc., filed a Statement of Right or Interest in the subject vessel. Contemporaneously Rederij Groen BV filed a Special Vessel Release Bond in lieu of Martin's arrest of the OMS RESOLUTION.

8. Bourbon Offshore Greenmar S.A., Bourbon Petrel SNC, CGG Services S.A., CGG Services U.S., Inc., and SNC Bourbon CE Petrel answered the BOURBON PETREL complaint on January 30, 2015.

9. Sea Support Ventures, LLC, CGG Services S.A., and CGG Services U.S., Inc. answered the MISS LILLY complaint on February, 13, 2015.

10. Rederij Groen BV, CGG Services S.A., and CGG Services U.S., Inc. answered the OMS RESOLUTION complaint on February, 13, 2015.

11. On March 3, 2015, the Court Consolidated the MISS LILLY and OMS RESOLUTION actions with the first filed BOURBON PETREL action.

12. OW Bunker USA Inc., filed a Notice of Restricted Appearance on March 5, 2015. OW filed a Notice of Filing Bankruptcy on March 3, 2015 and on April 7, 2017 filed a Motion to Stay the proceedings.

13. On May 14, 2015 the Court denied OW's Motion to Stay and subsequently allowed OW to file its Motion to Intervene in the proceedings. OW filed its Complaint in Intervention on May 27, 2015.

14.   On May 27, 2015, ING Bank N.V. sought to intervene, suggesting that it acted as OW's Security Agent and that OW had assigned to ING Bank OW's interest to the amount in dispute.

15.   ING Bank moved to dismiss its Intervention on March 4, 2016.

16.   OW moved to dismiss its Intervention on May 11, 2017.

17.   The defendants filed a Motion for Summary Judgment on August 28, 2018 seeking dismissal of all of Martin's claims.  The Court granted the Motion as to Martin's quantum meruit claims, but denied it as to Martin's *in* rem claims.

18.   A bench trial was completed on December 13, 2018.

**II.**
**Findings of Fact**

1.   CGGVeritas Services SA entered into an eighteen month time charter for the OMS RESOLUTION on December 8, 2011.

2.   CGGVeritas Services SA entered into a five year time charter for the use of the M/V BOURBON PETREL on February 15, 2013.

3.   CGG Veritas Services (U.S.) Inc. entered into a six month time charter for the use of the M/V MISS LILLY on August 16, 2012.

4.   Each of the charters provides that the charterer is responsible to procure fuel for the supply vessels during the term of the charter, and is required to defend and indemnify the owner against any liens claims arising from the supply of fuel.  For this reason, CGG Services U.S., Inc., as charterer, posted the bonds in lieu of arrest by Martin.

5.   The charters likewise provided that the vessels' engineers were to cooperate with the charterer's bunkering agent for bunker deliveries.  Randy Adams, corporate

representative for Sea Support Ventures, owner of the MISS LILLY, acknowledged that OW Bunker was CGG's bunkering agent for this fuel delivery.

6. CGG Services U.S., Inc. directed the operation of the three chartered vessels to support the Chinook and TGS seismic surveys it was conducting in the Gulf of Mexico.

7. The three supply vessels would support offshore seismic vessels by delivering to the seismic vessels fuel, water and other supplies essential to their continued operations.

8. The seismic vessels never came to port; instead, they relied upon the supply vessels as their "lifeline".

9. Martin is in the business of providing fuel and other services to vessels that call on its dock in Port Fourchon, Louisiana.

10. Only two fuel supply companies provide bunker services at Port Fourchon; Martin and John W. Stone ("Stone").

11. Prior to late October 2014, CCG would contact Martin directly to advise that one of the supply vessels would be returning to port in Fourchon. CGG would request that Martin be prepared to provide fuel and water to the support vessel upon its arrival at Port Fourchon.

12. The costs associated with the provision of the fuel and water by Martin to the support vessels were applied against credit Martin had extended to CGG.

13. In September or early October 2014, CGG had reached the maximum of the credit extended by Martin. Martin contacted CGG and advised that future fuel purchases would require payment in advance of delivery or CGG could pay outstanding invoices and "free up" space on its credit limit.

14.     In September or early October 2014 CGG had also reached the maximum of the credit extended to it by Stone, the only other fuel supplier in Port Fourchon.

15.     Rather than pay for Martin's fuel in advance of delivery or pay down the outstanding balance owed to Martin, CGG informed Martin on October 21, 2014 that it decided to make future fuel purchases through OW Bunker.  OW offered CGG sixty day payment terms as opposed to Martin's thirty day payment terms.  CGG and OW agreed to a fixed fee of $8.50 per metric ton as OW's fee for processing all transactions.

16.     As the MISS LILLY needed to come into port to take on fuel on or about October 27, 2014, CGG contacted OW Bunker and requested that OW solicit bids from fuel providers at Port Fourchon.

17.     Two suppliers, Martin and John W. Stone, provided bids at OW's request.  OW transmitted the two bids to CGG.

18.     CGG accepted Martin's bid, the lower of the two and issued its Purchase Order to OW for the amount of $317,634.67 which comprised Martin's fuel quote, $314,013.00, plus the commission CGG had previously agreed to pay OW, $3,621.67.  Thereafter, OW issued its Purchase Order to Martin.

19.     When the MISS LILLY arrived at Martin's fuel dock, its engineer was presented with Martin's form Declaration of Inspection and a partially completed Bunkering Certificate.  Martin physically gave the fuel hose to Mr. Valdez who connected it to the MISS LILLY's fuel manifold and controlled into which tanks the fuel was loaded.  Martin's representative, Wayne P. Doucet, and the MISS LILLY's engineer, Chad Valdez, then worked together to complete the documents with information from the fuel transaction.

20.     The Martin Bunkering Certificate contains the following language:

ALL SALES SUBJECT TO MARTIN ENERGY SERVICES LLC
STANDARD TERMS AND CONDITIONS OF SALE

* * *

No disclaimer stamp of any type or form will be accepted on this bunkering certificate, nor, should any such stamp be supplied, will it alter, change or waive MARTIN ENERGY SERVICES LLC's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

21.     Paragraph 5. of Martin's General Terms and Conditions states:

Non-Waiver of Lien.  In performing the Work, MES has relied upon the credit of the Purchaser and, if Work has been supplied to a vessel, MES has also relied upon the credit of the vessel.  MES shall have a maritime lien against said vessel until the invoice relating to said Work has been paid in full and MES expressly DOES NOT WAIVE any such maritime lien.

22.     Before the MISS LILLY departed Martin's fuel dock, Chad Valdez was presented with Martin's Meter Ticket, which reflects the total amount of fuel delivered to the MISS LILLY.  Mr. Valdez signed all of the documents as a representative of the MISS LILLY but only after confirming the quantity and the quality of the delivered fuel.

23.     When CGG informed OW that the OMS RESOLUTION was to make a port call on or about October 29, 2014, the foregoing process was repeated: OW solicited bids from Martin and Stone; CGG provided both bids to CGG; Martin provided the lowest bid; CGG accepted Martin's bid and issued its Purchase Order to OW reflecting Martin's fuel quote and OW's commission.  Thereafter, OW issued its Purchase Order to Martin.

24.     The OMS RESOLUTION arrived at Martin's fuel dock in Port Fourchon on October 29, 2014.  A representative of the vessel was provided with copies of Martin's Declaration of Inspection and Bunkering Certificate.  Martin and the vessel engineer worked to complete the paperwork.  As before, Martin gave the vessel's engineer its fuel hose

7

which was connected the OMS RESOLUTION's fuel manifold.  Pumping began and the engineer controlled where the fuel was loaded.  Upon completion of the fuel delivery, Martin's Meter Ticket was prepared and delivered to the engineer.  The OMS RESOLUTION's engineer then signed the documents and the vessel set sail.

25.    When CGG informed OW that the BOURBON PETREL was to make a port call on or about November 3, 2014, the foregoing process was repeated: OW solicited bids from Martin and Stone; CGG provided both bids to CGG; Martin provided the lowest bid; CGG accepted Martin's bid and issued its Purchase Order to OW reflecting Martin's fuel quote and OW's commission.  Thereafter, OW issued its Purchase Order to Martin.

26.    The BOURBON PETREL arrived at Martin's fuel dock in Port Fourchon on November 3, 2014.  A representative of the vessel was provided with copies of Martin's Declaration of Inspection and Bunkering Certificate.  Martin and the vessel engineer worked to complete the paperwork.  As before, Martin gave the vessel's engineer its fuel hose which was connected the BOURBON PETREL's fuel manifold.  Pumping began and the engineer controlled where the fuel was loaded.  Upon completion of the fuel delivery, Martin's Meter Ticket was prepared and delivered to the engineer.  The BOURBON PETREL's engineer then signed the documents and the vessel set sail

27.    Following the three fuel deliveries, Martin issued separate invoices to OW Bunker USA, Inc. for the fuel deliveries provided to the MISS LILLY, the OMS RESOLUTION, and the BOURBON PETREL.  The three invoices reflect a total owed of $1,226,294.29.

28.    Upon receipt of each of Martin's invoices OW Bunker generated its invoice to CGG Services U.S., Inc. reflecting the total amount of Martin's invoice plus the commission

for its services.  OW never attended the fuel deliveries and never took physical possession of the fuel.

29. CGG never paid the OW invoices.  OW never paid the Martin invoices.  Martin has never been paid for the fuel it delivered to the CGG supply vessels.

30. Unbeknownst to Martin at the time it made fuel deliveries to the CGG vessels, after the fully fueled CGG supply vessels left Martin's Port Fourchon fuel dock, they navigated to meet the CGG seismic vessels that had continued operating in their absence and, upon rejoining the fleet, the supply vessels each stored the fuel on board for a period of time and later transferred all or the majority of the fuel they had received from Martin to the seismic vessels.

31. The fuel Martin delivered to the three supply vessels constitutes a "necessary" whether the supply vessels consumed the Martin fuel or not.

32. While each supply vessel may have been capable of assisting with the ongoing seismic surveys to varying degrees, a primary and essential function was as a floating gas station for the benefit of the seismic vessels so that they could remain offshore and not have to make port for fuel, water and other supplies.

33. Even if the three supply vessels could have provided propulsion, steerage, or towage to the seismic fleet in an emergency situation, for the two CGG seismic surveys for which the supply vessels received Martin's fuel, none were required to serve in that capacity.

III.
Conclusions of Law

1. The purpose of maritime liens is "to enable a vessel to obtain supplies or repairs necessary to her continued operation by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more formal security given."

9

*Southern Coal & Coke Co. v. F. Grauds Kugniecibas* ("The Everosa"), 93 F.2d 732, 735 (1st Cir. 1938); see also *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 9, 65 L. Ed. 97, 41 S. Ct. 1 (1920) ("Since she is usually absent from the home port, remote from the residence of her owners and without any large amount of money, it is essential that she should be self-reliant - that she should be able to obtain upon her own account needed repairs and supplies."); *A.L. Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d 880, 883 (5th Cir. 1974) ("The very purpose of maritime liens is to encourage necessary services to ships whose owners are unable to make contemporaneous payment."). They are largely statutorily created. See *In re Admiralty Lines, Ltd.*, 280 F. Supp. 601, 604-05 (E.D. La. 1968) ("Admiralty law has long ago ceased to create new liens. The only liens recognized today are those created by statute and those historically recognized in maritime law."). Thus, in order to resolve the issues raised in this case, we must look to the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 et seq., which defines the circumstances under which a party is entitled to a maritime lien.

2.    The CIMLA states that a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner has a maritime lien on the vessel, see § 31342(a), unless the provider of the necessaries has waived its right to the lien. See § 31305. Section 31341(a) lists entities presumed to have authority to procure necessaries: (1) the owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply; or (4) an officer or agent appointed by the owner, a charterer, an owner pro hac vice, or an agreed buyer in possession of the vessel. An element common to these entities is that they may be presumed to have authority to procure necessaries on

the vessel's account. *Cf. Ferromet Resources v. Chemoil Corp.*, 5 F.3d 902, 904 (5th Cir. 1993) ("The ship's master or other person, such as a charterer, to whom the vessel is entrusted is presumed to have authority to purchase necessaries to the credit of the vessel.").

3.    A person who supplies necessaries to a vessel has a maritime lien over the vessel by operation of the Commercial Instruments and Maritime Liens Act (formerly known as the Federal Maritime Liens Act), 46 U.S.C. §31342, which provides:

> (a)    Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>
> > (1)    has a maritime lien on the vessel;
> >
> > (2)    may bring a civil action in rem to enforce the lien; and
> >
> > (3)    is not required to allege or prove m the action that credit was given to the vessel.
>
> (b)    This section does not apply to a public vessel.

4.    If the requirements stated in CIMLA are satisfied, the maritime lien conferred is statutory in nature. It depends neither on any contract between the parties, nor on the operation of the general maritime law. *Ventura Packers, Inc. v. FV Jeanine Kathleen,* 305 F.3d 913, 920, 2002 AMC 2248 (9th Cir. 2002). All that matters is that the statutory requirements stated in CIMLA have been satisfied. If the statutory requirements are satisfied, a maritime lien is conferred on the necessaries supplier, no matter what the contractual relationship between the parties in question. In *Ventura Packers*, the U.S. Court of Appeals for the Ninth Circuit said (305 F.3d at 920, 2002 AMC at 2255):

> [T]he maritime lien for necessaries created by § 31342 is not predicated on the existence of a maritime contract. Section 31342 does not mention a maritime contract requirement, and we have

11

unearthed no reason to impute one. Instead the statute provides for an action in admiralty if necessaries were provided to a vessel 'on the order of the owner or a person authorized by the owner'. Necessaries provided on the order of the owner do not inherently require a maritime contract, and nothing hints that Congress intended the 'order' of necessaries to be synonymous with `maritime contract' for necessaries.

5. Thus, the question whether Martin has a maritime lien over the BOURBON PETREL, the OMS RESOLUTION and the MISS LILLY turns on whether the statutory requirements stated in 46 U.S.C. §31342 are satisfied in this case.

6. Section 31342 of CIMLA is generally interpreted as imposing three separate requirements for the conferral of a statutory maritime lien: (a) the claimant must have provided necessaries; (b) the claimant must have provided them to a vessel; and (c) the necessaries must have been provided on the order of the owner or a person authorized by the owner. *Farwest Steel Corp. v. Barge Sea-Span,* 769 F.2d 620, 623 (9th Cir. 1985); *Marine Fuel Supply & Towing, Inc. v. MN Ken Lucky,* 869 F.2d 473, 476 (9th Cir. 1988); *Galehead, Inc. v. MN Anglia,* 183 F.3d 1242, 1244 (11th Cir. 1999).

7. "'[N]ecessaries' includes repairs, supplies, towage, and the use of a dry dock or marine railway," 46 U.S.C. § 31301(4), as well as "most goods or services that are useful to the vessel, keep her out of danger and enable her to perform her particular function." *Trico Marine Operators, Inc. v. Falcon Drilling Co.*, 116 F.3d 159, 162 (5th Cir. 1997) (quoting *Equilease*, 793 F.2d at 603); see *Farrell Ocean Servs., Inc. v. United States*, 681 F.2d 91, 92-93 (1st Cir. 1982).

8. "It is the present, apparent want of the vessel . . . which makes it a necessary." *Equilease*, 793 F.2d at 603 (quoting 2 Benedict on Admiralty § 34 (7th ed. 1984)).

9. Consistent with the goal of protecting those who provide vessels with required goods and services, courts have broadly interpreted what constitutes "necessaries" under the Act in

12

light of the vessel's particular function. *See, e.g.*, *Stern, Hays & Lang, Inc. v. M/V Nili*, 407 F.2d 549 (5th Cir. 1969) (advertising services for cruise ship); *Walker-Skageth Food Stores v. The Bavois*, 43 F. Supp. 109, 111 (S.D.N.Y. 1942) (liquor for pleasure yacht); *Allen v. The Contessa*, 196 F. Supp. 649, 651 (cigarettes for shrimping vessel); T*rico Marine Operators*, 116 F.3d at 162 (transportation of drinking water, food, drilling equipment, and supplies constituted "necessaries"); *Port Ship Serv., Inc. v. Int'l Ship Mgmt. & Agencies Serv., Inc*., 800 F.2d 1418, 1421 (5th Cir. 1986) (water taxi service to and from vessel may give rise to a maritime lien); *Equilease*, 793 F.2d at 600 (finding that insurance is a "necessary" to keep a vessel in commerce, giving rise to a maritime lien); Sec. *Pac. Bank of Wash. v. September Morn*, 754 F. Supp. 813, 814-15 (W.D. Wash. 1990) (services to secure, prepare, and file documents in connection with marine mortgages were "necessary").  For example, in *Portland Pilots v. NOVA STAR, M/V*, the First Circuit held that linens supplied to a vessel serving as "the functional equivalent of a mobile hotel" were necessaries. 875 F.3d 38, 45 (1st Cir. 2017) (Though the in rem claim asserted "bears no particular relation to the NOVA STAR <u>qua</u> a ship ... Appellant may still be entitled to a maritime lien by showing that it provided items that were 'necessary' to the ship's intended purpose."). Because "hotels, by their very nature, require clean linens," the linens enabled the ship to perform her particular function and gave rise to a maritime line. *Id.; see also J. Ray McDermott & Co. v. Off-Shore Menhaden Co.*, 262 F.2d 523, 525 (5th Cir. 1959) (To determine which goods and services are necessaries, "regard must be had to the character of the voyage or the employment in which the vessel is being used."); *Foss Launch & Tug Co. v. Char. Ching Shipping U.S.A., Ltd.*, 808 F.2d 697, 699 (9th Cir. 1987) (The term "necessaries," "in modern interpretations, has been

13

expanded to encompass any item which is reasonably needed for the venture in which the ship is engaged.") (internal quotations omitted).

10. CIMLA defines "necessaries" as including "repairs, supplies, towage, and the use of a dry dock or railway". 46 U.S.C. §31301(4). There has never been any doubt that bunkers are "necessaries" for the purposes of CIMLA (and its predecessors), as they are useful to the vessel to which they are supplied, and enable it to perform its particular function. *Piedmont Coal* Co. *v. Seaboard Fisheries* Co., 245 U.S. 1, 41 S.Ct. 1 (1920) (bunkering coal); *Bominflot, Inc. v. MN Henrich S,* 465 F.3d 144, 147; 2006 AMC 2510, 2514 (4th Cir. 2006); *Trans-Tee Asia v. MN Harmony Container,* 518 F.3d 1120, 1127 n.9, 2008 AMC 684, 693 n.9 (9th Cir. 2008). Indeed, it is usually agreed by the parties that bunkers constitute necessaries for purposes of CIMLA. See, e.g., *Marine Fuel Supply & Towing, Inc. v. MN Ken Lucky,* 869 F.2d 473,476 (9th Cir. 1988); *Galehead, Inc. v. MN Anglia,* 183 F.3d 1242, 1245 (11th Cir. 1999).

11. Whether the bunkers received by the three supply vessels were consumed by the vessels or were transferred in whole or in part to the seismic vessels does not alter their character as "necessaries". Martin's bunkers enabled the three supply vessels "to perform their particular function". Even if the supply vessels could perform other functions for the benefit of the seismic fleet, their function as "floating gas stations" was only accomplished through the receipt of Martin's bunkers.

12. Although Martin received the order for the bunkers from O.W. Bunker, USA, Inc., the cases show that it is sufficient that the order for the bunkers was first made by the owner or charterer of the vessel (or an agent appointed by one of them), and that the order was satisfied by the supply of bunkers by Martin to the vessel. The number of intermediaries

14

between the master, owner or charterer of the vessel and Martin, and their precise role, is immaterial.

13.     In cases such as this, where the order for necessaries is not made directly by the owner or other authorized person to the necessaries supplier, the courts have distinguished between two general categories of case: (a) the "general contractor/subcontractor" line of cases; and (b) the "principal/agent, or middle-man" line of cases. *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV,* 199 F.3d 220, 228-29 (5th Cir. 1999). (*In Crescent City Marine, Inc. v. MV Nunki,* 20 F.3d 665, 667 (5th Cir. 1994), the U.S. Court of Appeals for the Fifth Circuit characterized the first category somewhat more narrowly, as the "restrictive repair contractor" line of cases.)

14.     In the "general contractor/subcontractor" line of cases, a general contractor contracts to supply some necessary goods or services to a ship, but then subcontracts some or that entire task to a subcontractor. In this situation, courts have generally held that the general contractor has a maritime lien but the subcontractor does not. See, e.g., *Port of Portland v. MV Paralla,* 892 F.2d 825 (9th Cir. 1990); *Crescent City Marine, Inc. v. MV Nunki,* 20 F.3d 665 (5th Cir. 1994); *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV,* 199 F.3d 220 (5th Cir. 1999).

15.     There is, however, an exception to the general rule: "The sole exception to the rule against the subcontractor lien will occur where the subcontractor has been engaged by a general contractor in circumstances **where the general contractor was acting as an agent at the direction of the owner to engage specific subcontractors**," *U.S. Oil Trading LLC v. M/V Vienna Express*, 911 F.3d 652 (2nd Cir. 2018) citing *Farwest Steel Corp. v. Barge Sea-Span 241*, 828 F.2d 522, 526 (9th Cir. 1987) ("*Farwest*") (emphasis

15

added), *cert. denied*, 485 U.S. 1034 (1988), *i.e.*, where "an entity authorized to bind the ship *controlled the selection* of the subcontractor and/or its performance." *Lake Charles*, 199 F.3d at 229 (emphasis added). *See*, *e.g.*, *Port of Portland v. M/V PARALLA*, 892 F.2d 825, 828 (9th Cir. 1989) ("*Port of Portland*") (the subcontractor may be entitled to a lien "if the owner has ordered the general contractor to retain that subcontractor").

16.   Under this "minimal exception," *Cianbro Corp. v. George H. Dean, Inc.*, 596 F.3d 10, 17 (1st Cir. 2010) ("*Cianbro*"), a subcontractor is not entitled to assert a maritime lien "unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance," *Id*. (internal quotation marks omitted); *Valero Marketing & Supply Co. v. M/V ALMI SUN*, 893 F.3d 290, 293 (5th Cir. 2018) ("*Valero*") (internal quotation marks omitted).  *U.S. Oil Trading LLC v. M/V Vienna Express*, 911 F.3d at 663.  The "exception to th[e] general rule . . . applies when the vessel owner directs the general contractor to use a particular subcontractor."  *Bunker Holdings Ltd. v. Yang Ming Liberia Corp.*, 906 F.3d 843, 846 (9th Cir. 2018) ("*Yang Ming*").

17.   The facts of the three fuel deliveries at issue in this case differ from those presented in *Valero*, 893 F.3d 290 (5th Cir. 2018).  CGG was more than "merely aware" that Martin was the supplier of the fuel at issue.  Unlike *Valero*, CGG controlled the selection of Martin as the supplier of fuel for its supply vessels.

18.   While OW sought bids from the suppliers in Port Fourchon, Martin and Stone, CGG controlled the selection of Martin as supplier.  CGG received bids from both Martin and Stone from OW.  CGG selected Martin's bid and in each instance created its own Purchase Orders using the lower Martin quote.  CGG would instruct OW to bind the deal

16

with Martin and thereafter the CGG supply vessels contacted Martin directly to confirm logistics for their refueling.

19. The control that CGG exercised by selecting Martin's lower bid in each of the three fuel deliveries at issue rises to the level of "authorization" by the vessel owner or one authorized by the owner.  In contrast, see *NuStar Energy Servs., Inc. v. M/V COSCO Auckland*, No. 17-20246, 2019 WL 192408  (5th Cir. Jan. 14, 2019) (vessel owner's agent's knowledge of physical supplier's identity and vessel's employees overseeing and acceptance of deliveries insufficient "authorization").  Here, CGG not only knew Martin would be the supplier of fuel in each of the three deliveries at issue but it also selected Martin to be the supplier either directly or by way of its standing order to OW to accept the lowest quote received.  *See also Martin Energy Services, LLC v. M/V BRAVANTE IX*, 733 Fed.Appx. 503, 507 (11th Cir. 2018), while affirmed on other grounds, noting that the district court found that Martin had a valid maritime lien.

20. Martin never waived its maritime lien rights against a customer prior to the transactions at issue and did not waive its maritime lien rights against CGG, OW, or the vessels, BOURBON PETREL, OMS RESOLUTION and MISS LILLY, in the subject transactions.

21. Under maritime law, absent exceptional circumstances a prevailing plaintiff is entitled to prejudgment interest, at a rate to be determined by the Court. *Ins.* Co. *of North America v. MN OCEAN LYNX, 901 F.2d 934 (11th Cir. 1990).* Martin's invoice provides for interest at the rate of 1.5% per month after 30 days from the date of the invoice. At least one other court has awarded interest on that basis.  *Offshore Marine Contrs. v. Palm Energy Offshore, LLC,* Civ. Act. No. 10-4151, 2013 WL 6858911 (E.D. La. Dec. 30, 2013) aff. 779 F.3d 345 (5th Cir. 2015).  Other recent court decisions establish rates ranging from 3% to 9%.  See,

*e.g. Deakle v. John E. Graham & Sons,* 756 F.2d 821 (11th Cir. 1985) (9%); *National*

*Liability & Fire Ins.* Co. *R&R Marine, Inc.,* 756 F.3d 825, 839 (5th Cir. 2014) (6%);

*Simmons v. Transocean Offshore Deepwater Drilling, Inc.,* 551 F. Supp. 2d 471, 478 (ED.

La. 2008) (3%).

Respectfully submitted,

**DEUTSCH, KERRIGAN LLP**


By:    */s/ Walter P. Maestri*
       Walter P. Maestri (La. Bar No. 25776)
       755 Magazine Street
       New Orleans, LA 70130
       (504) 581-5141 – Telephone
       (504) 566-1201 – Facsimile
       wmaestri@deutschkerrigan.com

**ATTORNEYS FOR PLAINTIFF MARTIN**
**ENERGY SERVICES, LLC**

**OF COUNSEL:**
**CLARK HILL STRASBURGER**
F. WILLIAM MAHLEY
Texas Bar No. 12836740
Clark Hill Strasburger
909 Fannin, Suite 2300
Houston, Texas 77010
(713) 951-5600 – Telephone
(713) 951-5660 – Facsimile
bill.mahley@clarkhillstrasburger.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21[th] day of January 2019, I electronically filed the

foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of

electronic filing to all counsel of record.

*/s/ Walter P. Maestri*
**WALTER P. MAESTRI**

18