# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARTIN ENERGY SERVICES, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-2986**<br>**c/w 15-79 c/w 15-81** |
| **M/V BOURBON PETREL, her engines, tackle, bunkers, Etc., *in rem*, and BOURBON PETREL SNC AND BOURBON OFFSHORE GREENMAR, S.A., *in personam*** | **SECTION "L" (4)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.  **FACTUAL AND PROCEDURAL HISTORY**

These consolidated cases arise out of three instances in which Plaintiff Martin Energy Services, LLC ("Martin Energy") supplied fuel and water to a fleet of vessels chartered by C.G.G. Services, U.S., Inc. ("CGG"). In the fall of 2014, CGG was conducting seismic operations off the coast of Louisiana with the GEO CELTIC, OCEANIC SIRIUS, and OCEANIC VEGA (collectively, the "Seismic Vessels"). CGG was responsible for ensuring that the Seismic Vessels were supplied with fuel and water.

Before the three fuel deliveries at issue in this case, CGG purchased fuel directly from suppliers like Martin Energy. In October 2014, however, CGG reached its credit limit with Martin Energy and began purchasing fuel for the Seismic Vessels through O.W. Bunker USA Inc. ("O.W. Bunker"). Martin Energy was selected as supplier of the fuel because it offered the lowest sales price.

1

The fuel was delivered to the Seismic Vessels by three supply vessels – the M/V BOURBON PETREL, the M/V OMS RESOLUTION, and the M/V MISS LILLY (collectively, the "Supply Vessels"). Soon after, O.W. Bunker declared bankruptcy and failed to pay Martin Energy for the three fuel deliveries. Martin Energy sued each of the Supply Vessels *in rem*, claiming a maritime lien for the amounts owed for the bunkering. The vessels deny *in rem* liability.

This case mirrors dozens of *in rem* actions resulting from the global collapse of O.W. Bunker and related bankruptcy proceedings. It presents two issues in particular: (1) whether CGG controlled the selection of Martin Energy as physical supplier, and (2) whether the bunkers qualify as necessaries for the Supply Vessels (thereby triggering *in rem* liability) when they were ultimately consumed by the Seismic Vessels.

The Court has carefully considered the testimony of the witnesses, the exhibits entered into evidence, the post-trial memoranda, and the entire record, and hereby enters the following findings of fact and conclusions of law. To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such. And to the extent that a conclusion of law constitutes a finding of fact, the Court adopts it as such.

## II.    FINDINGS OF FACT

(1)

Plaintiff Martin Energy is a Houston, Texas based provider of fuels, lubricants, and full-service logistical support along the United States Gulf of Mexico

(2)

CGG Services U.S., Inc. ("CGG") is the United States subsidiary of CGG SA, a global geoscience company that conducts seismic operations for oil and gas companies.

(3)

In the fall of 2014, CGG U.S. was conducting seismic operations off the coast of Louisiana with the survey vessels M/V GEO CELTIC, M/V OCEANIC SIRIUS, and M/V OCEANIC VEGA (collectively, the "Seismic Vessels").

(4)

CGG was responsible for ensuring that the Seismic Vessels were supplied with fuel and water. The fuel and water were delivered from Port Fourchon, Louisiana to the Seismic Vessels off the coast of Louisiana by three supply vessels: the M/V BOURBON PETREL, M/V OMS RESOLUTION, and M/V MISS LILLY (collectively, the "Supply Vessels").

(5)

The M/V BOURBON PETREL is a Seismic Support Vessel. It was owned by SNC Bourbon CE Petrel. The M/V OMS RESOLUTION is also a Seismic Support Vessel that was owned by Rederij Groen BV. The M/V MISS LILLY is an Offshore Supply Vessel that was owned by Sea Support Ventures, LLC. All of the Supply Vessels were chartered directly or indirectly by CGG.

(6)

Prior to October 2014, CGG purchased fuel for the Seismic Vessels directly from the two suppliers at Port Fourchon, Martin Energy and Stone Oil. In October 2014, however, CGG had reached its credit limit with Martin Energy. Martin Energy informed CGG that CGG must either pay in advance or "free up space" on its credit limit before Martin Energy would sell any more fuel directly to CGG. CGG then began purchasing fuel for the Seismic Vessels from O.W. Bunker USA, Inc. ("O.W. Bunker") pursuant to a September 16, 2013 Bunker Supply Contract.

(7)

When purchasing fuel from O.W. Bunker, CGG would notify O.W. Bunker of its anticipated fuel needs and the estimated date that the M/V BOURBON PETREL, M/V OMS RESOLUTION, and M/V MISS LILLY would arrive in Port Fourchon to receive the fuel. O.W. Bunker would contact Martin Energy and Stone Oil to determine their fuel availability and the sales price, which O.W. Bunker would then communicate to CGG. CGG instructed O.W. Bunker to purchase fuel from the supplier with the lower cost, Martin Energy.

(8)

For each of the transactions at issue here,

   a. CGG issued purchase orders to O.W. Bunker for the fuel to be loaded aboard the Supply Vessels

   b. O.W. Bunker issued sales order confirmations to CGG

   c. O.W. Bunker issued purchase order confirmations to Martin Energy

   d. Martin Energy issued invoices to the Supply Vessels care of O.W. Bunker for the sale of the fuel

   e. O.W. Bunker issued invoices addressed to the applicable Supply Vessel "and/or Owners/Charterers, CGG Services, US, Inc." in Houston for the sale of the fuel, which included a commission to O.W. Bunker.

(9)

Pursuant to these purchase orders and invoices, Martin Energy delivered:

   a. 450 cubic meters (118,000 gallons) of low sulfur diesel and 15,200 gallons of water to the M/V MISS LILLY on October 27, 2014, in the amount of $314,013.00.

   b. 800 cubic meters (210,860 gallons) of low sulfur diesel and 10,900 gallons of water to the OMS RESOLUTION on October 29, 2014, in the amount of $557,069.29.

   c. 500 cubic meters (132,000 gallons) of low sulfur diesel to the M/V BOURBON PETREL on November 5, 2014, in the amount of $355,212.00.

4

(10)

The three fuel deliveries were put in the cargo tanks of the M/V BOURBON PETREL, M/V OMS RESOLUTION, and M/V MISS LILLY.

(11)

The M/V BOURBON PETREL and OMS RESOLUTION have fuel cargo tanks that are physically separate from and not connected to the vessels' "day tanks" that supply fuel to the vessels' engines.

(12)

Because their cargo tanks and day tanks are physically separated, the M/V BOURBON PETREL and OMS RESOLUTION did not consume any of the fuel supplied by Martin Energy. That fuel was cargo to be delivered to the Seismic Vessels for the Seismic Vessels' use. The M/V BOURBON PETREL transferred 750 cubic meters of fuel (including the 500 cubic meters supplied by Martin Energy) to the Seismic Vessel GEO CELTIC. The OMS RESOLUTION transferred 800 cubic meters of fuel to the Seismic Vessel OCEANIC VEGA.

(13)

The M/V MISS LILLY has piping that connects its cargo tanks to its day tanks, and it is capable of and did in fact transfer quantities of fuel from its cargo tanks to its day tanks during the time period at issue.

(14)

The M/V MISS LILLY already had approximately 13,895 gallons of diesel fuel onboard ("Onboard Diesel") before it was loaded with 450 cubic meters (118,800 gallons) of Martin Energy low sulfur diesel on October 27, 2014. On November 6, 2014, the M/V MISS LILLY transferred 34,654 gallons of diesel to the OCEANIC VEGA. On November 10, 2014, the M/V MISS LILLY

transferred 45,598 gallons of diesel to the OCEANIC SIRIUS. On November 15, 2014, the M/V MISS LILLY transferred 112,000 gallons of diesel to the OCEANIC VEGA.

(15)

Between October 27, 2014, the date when the Martin Energy was put in the M/V MISS LILLY's cargo tanks, and November 15, 2014, the date the M/V MISS LILLY made the final fuel transfer, the M/V MISS LILLY transferred 12,788 gallons of diesel fuel from its cargo tanks to its day tanks. Thus, the MISS LILLY had sufficient fuel onboard to reach the Seismic Vessels prior to being loaded with the Martin Energy fuel.

### III. CONCLUSIONS OF LAW

(1)

This Court has subject matter jurisdiction pursuant to 33 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

(2)

The Commercial Instruments and Maritime Liens Act ("CIMLA"), provides that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner … has a maritime lien on the vessel [and] may bring a civil action in rem to enforce the lien." 42 U.S.C. § 31342(a). In this case, for a maritime lien to exist, the bunkers must qualify as necessaries and they must have been provided on the order of the owner.

(3)

The term "necessary" "includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function." *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986) (en banc). Necessaries are the "things that a prudent owner would provide to enable a ship to perform well the functions for which she has been

6

engaged," and, importantly, "it is the present, apparent want of the vessel, not the character of the thing supplied, which makes it a necessary." *Id.*

(4)

To determine which goods and services are necessaries, "regard must be had to the character of the voyage or the employment in which the vessel is being used." *J. Ray McDermott & Co. v. Off-Shore Menhaden Co.*, 262 F.2d 523, 525 (5th Cir. 1959). *See also Foss Launch & Tug Co. v. Char. Ching Shipping U.S.A., Ltd.*, 808 F.2d 697, 699 (9th Cir. 1987) (The term "has been expanded to encompass any item which is reasonably needed for the venture in which the ship is engaged"); *Ajubita v. S/S Peik*, 428 F.2d 1345, 1346 (5th Cir. 1970) (Necessaries "include expenditures that are not absolutely indispensable" and are "convenient or useful to the vessel").

(5)

Courts have broadly interpreted what constitutes "necessaries" under the Act in light of the vessel's particular function. *See, e.g.*, *Stern, Hays & Lang, Inc. v. M/V Nili*, 407 F.2d 549 (5th Cir. 1969) (advertising services for cruise ship); *Walker-Skageth Food Stores v. The Bavois*, 43 F. Supp. 109, 111 (S.D.N.Y. 1942) (liquor for pleasure yacht); *Allen v. The Contessa*, 196 F. Supp. 649, 651 (cigarettes for shrimping vessel); *Portland Pilots v. NOVA STAR, M/V*, 875 F.3d 38, 45 (1st Cir. 2017) (linens supplied to a vessel serving as "the functional equivalent of a mobile hotel").

(6)

The M/V BOURBON PETREL and the M/V OMS RESOLUTION are seismic support vessels. Their missions were to deliver fuel, water, and other supplies to the Seismic Vessels and to tow the Seismic Vessels if they lost power or steerage. R. Doc. 152 at 100-111. In any two-week period, the M/V BOURBON PETREL and the M/V OMS RESOLUTION spent 12 days

7

offshore with the Seismic Vessels and 2 days traveling to and from Port Fourchon delivering fuel, water, and other supplies to the Seismic Vessels.

(7)

The Martin Energy fuel was necessary for the M/V BOURBON PETREL and the M/V OMS RESOLUTION to function as seismic support vessels. Part of that function required the M/V BOURBON PETREL and the M/V OMS RESOLUTION to serve as "floating gas stations" so that the Seismic Vessels could remain offshore. The Martin Energy fuel enabled the M/V BOURBON PETREL and the M/V OMS RESOLUTION to perform their intended function as seismic support vessels for the benefit of the Seismic Vessels.

(8)

The M/V MISS LILLY is an offshore supply vessel. She traveled to and from Port Fourchon once a week to transport fuel, equipment, personnel, and data tapes to and from Port Fourchon. Martin Energy's bunkers were necessary for the M/V MISS LILLY to function as an offshore supply vessel for the Seismic Fleet.

(9)

Next, for a lien to exist, Martin Energy must have provided the fuel on the order of the owner or a person authorized by the owner. It is undisputed that Martin Energy supplied the fuel at the request of O.W. Bunker. The Fifth Circuit has established that this situation falls within the "subcontractor" line of cases. *Valero Marketing & Supply Co. v. M/V Almi Sun*, 893 F.3d 290 (5th Cir. 2018). Subcontractors "are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." *Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 202, 229 (5th Cir. 1999). Thus, to be entitled to a maritime lien, CGG must have "controlled [Martin Energy's]

8

selection … and/or its performance," and "mere awareness" that Martin Energy would be the physical supplier is not enough. *Valero*, 893 F.3d at 294.

(10)

CGG controlled the selection of Martin Energy. For each of the deliveries, O.W. Bunker contacted Stone Oil and Martin Energy to determine their fuel ability and sales price. O.W. Bunker communicated two quotes – one from Stone Oil and one from Martin Energy – to CGG. R. Doc. 152 at 74, 132-33. CGG instructed O.W. Bunker to select the supplier with the lowest price, and CGG incorporated the price quoted by Martin Energy in the Purchase Order Confirmations it issued to O.W. Bunker.[1] That is more than "mere awareness." *See* Defense Exhibit 5, emails from Daria Vlasova to CGG personnel, stating: "OW Bunkers will revert with 2 offers from the 2 physical suppliers in fourchon … *You have to indicate to OW which offer you'd like to proceed* (cheapest price provided that all conditions are the same, i.e. delivery date, quantity);" "As per contract OW will propose open book two quotes from 2 physical suppliers + service fee (8.5$/MT). *CGG would choose the best option / physical source* for us based on the 2 quotes provided." (emphasis added). *See also* R. Doc. 152 at 77 ("Q. O.W. Bunker went out and got those two quotes? A. Yes. Q. Reported them back to CGG, correct? A. Yes. Q. CGG picked the lowest price, correct? A. Yes, sir. Q. And then O.W. Bunker went back and bound the deal with Martin based on that election, correct? A. Yes, sir …").

(11)

---

[1] Defendants often stress that "None of the Purchase Order Confirmations issued by CGG or Sale Order Confirmations from O.W. Bunker make any mention of Martin." R. Doc. 154 at 3. That is partly true. O.W. Bunker's Sale Order Confirmations do identify "Martin" as the physical supplier (Defense Exhibits 12, 18, 26). And although CGG's Purchase Order Confirmations do not name Martin Energy, they do incorporate the price quoted by Martin Energy.

9

Lastly, Martin Energy must have relied on the credit of the vessels. Under the CIMLA, a supplier of necessaries "is not required to allege that credit was given to a vessel." 46 U.S.C. § 31342(a)(3). Rather, a presumption arises that the supplier acquires a maritime lien, and the party attacking this presumption must establish that the personal credit of the owner or another third party was solely relied upon. *Racal Survey U.S.A., Inc. v. M/V COUNT FLEET*, 231 F.3d 183, 189 (5th Cir. 2000). "To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien." *Id., see also Pacorini USA Inc. v. ROSINA TOPIC MV*, 127 F. App'x 126, 130 (5th Cir. 2005) ("To overcome this presumption, a defendant bears the burden of showing that the plaintiff took affirmative actions that manifested plaintiff's clear, purposeful, and deliberate intention to forego the maritime lien.").

(12)

"[T]he statutory presumption in favor of a maritime lien is a strong one," and courts are "usually reluctant to conclude that a supplier has waived its lien." *Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 471 (5th Cir. 2003). As long as the supplier relied on the vessel *to some extent*, waiver will not be found. *Id.* at 473 ("[A]lthough the testimony as a whole shows that Maritrend relied on [the charterer] for payment, it also shows that Maritrend did not rely solely on [the charterer] because it was aware of and generally relied upon its maritime lien rights against the SEVILLA WAVE … Maritrend always intended to rely on the credit of the vessel as a 'fallback'").

(13)

The fact that Martin Energy refused to extend credit directly to CGG and instead contracted with O.W. Bunker does not establish that Martin Energy deliberately intended to forego its lien.

10

The Martin Energy invoices for the fuel at issue here incorporated Martin Energy's General Terms & Conditions, which provided that:

> In performing the Work, MES has relied upon the credit of Purchaser and, if Work has been supplied to a vessel, MES has also relied upon the credit of the vessel. MES shall have a maritime lien against said vessel until the invoice relating to said Work has been paid in full and MES expressly DOES NOT WAIVE any such maritime lien.

Additionally, at each delivery, an Authorized Officer of the Supply Vessel signed a Bunkering Certificate, which stated that:

> No disclaimer or stamp of any type or form will be accepted on this bunkering certificate, nor, should any such stamp be applied, will it alter, change, or waive MARTIN ENERGY SERVICES LLC's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

(14)

That Martin Energy relied partly – or even primarily – on O.W. Bunker in supplying the fuel does not establish that it intended to forego its lien. The Bunkering Certificates and invoices suggest that Martin Energy was aware of its lien rights and ability to assert them as a "fallback position" in the event of non-payment by O.W. Bunker. *See C-Port/Stone, LLC v. Gulf Logistics, LLC in personam, M/V GREY CUP in rem*, No. 17-256, 2018 WL 4680213, at *2 (E.D. La. Sept. 28, 2018) ("Further, the standard language in C-Port/Stone's delivery tickets expressly stated that C-Port/Stone was affirmatively relying on its presumed rights under maritime law to encumber the vessel in satisfaction of the invoices for the products delivered.").

(15)

"Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *Offshore Marine Contractors, Inc. v. Palm Energy Offshore, L.L.C.,* 779 F.3d 345, 351 (5th Cir. 2015) (quoting *Reeled Tubing, Inc. v. M/V*

*Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986)). "Courts often look to invoices when fixing prejudgment interest." *Id.* Martin Energy's invoices provide for an interest rate of 1.5% per month after 30 days from the date of the invoice. In the Fifth Circuit, "the date of injury, rather than the date of judicial demand, [is] the proper date from which prejudgment interest should run." *Sea Link Cargo Servs. Inc. v. Marine Ctr. Inc.*, 380 F. App'x 460, 464 (5th Cir. 2010).

## IV. CONCLUSION

On the basis of the foregoing Findings of Fact and Conclusions of Law, the Court finds that Plaintiff Martin Energy Services, LLC is entitled to: $314,013.00 for the fuel provided to the M/V MISS LILLY; $355,212.00 for the fuel provided to the M/V BOURBON PETREL; and $557,069.29 for the fuel provided to the M/V OMS RESOLUTION, plus prejudgment interest at the rate of 1.5% per month from the date of each purchase (excluding the time the matter was stayed upon joint request by the parties), and postjudgment interest at the federal rate until paid.

New Orleans, Louisiana this 6th day of June, 2019.

_____
UNITED STATES DISTRICT COURT JUDGE